ARTHUR P. SNOW & others[1] *vs.* MASSACHUSETTS TURNPIKE AUTHORITY.

Worcester.    September 22, 1959. — November 2, 1959.

Present: WILKINS, C.J., RONAN, COUNIHAN, WHITTEMORE, & CUTTER, JJ.

*Evidence,* Plan, Best and secondary.

In assessing damages for a taking of land for a highway, where the quantity of sand and gravel on the land was pertinent, a plan showing data, obtained by borings on the land, as to the nature of the materials at various depths at the locations of the borings was admissible on testimony by an engineer in charge of the design and construction of the section of the highway at the location of the land that he had observed the land, had obtained the field information in connection with the borings, had translated such information to a draftsman and had it marked on the plan, and had supervised the preparation of the plan. [622]

A plan, otherwise admissible in evidence, might properly be admitted in the discretion of the judge although it was a blueprint copy of an original on cloth where there was nothing to show that the blueprint was not a true copy. [623]

PETITION, filed in the Superior Court on January 5, 1956.

Following trial before *Noonan, J.,* the petitioners alleged exceptions.

*Walter J. Griffin,* for the petitioners.

*Edward P. Healy,* for the respondent.

CUTTER, J.    This is a petition under G. L. c. 79 for assessment of damages caused by a taking of land for the Massachusetts turnpike. An auditor's report, introduced

[1] Joseph Walter Snow and Estelle M. Rivard.

in evidence, stated that "the highest, best . . . use of the premises . . . is for the . . . sale of sand and gravel," and that the petitioners' total damage, exclusive of interest, was $22,500. At a trial before a jury there was a verdict for the petitioners in the sum of $14,250, exclusive of interest.

At the jury trial, the respondent called as a witness "a duly qualified civil engineer." He testified that the members of his firm were "section engineers for this portion of the turnpike . . . ; that there was one general consultant for the turnpike . . . in charge of engineering, and there were seven or eight so called section engineers . . . [who] did the design and supervised the construction of the pike." The witness was "supervisor-manager for his company on this project" and "had complete charge . . . through the design stages and . . . the completion of construction." He knew the relevant area, had "observed" the petitioners' property, and testified that "[b]orings were made on that area . . . to determine the type of earth . . . where the borings were taken." He produced a plan, in the preparation of which he "had a hand," in that he obtained "the information from the field, as far as [the] borings were concerned," translated "it to a draftsman," and had "it drawn on this plan." The plan was "a drawing from an original on cloth" and "was a tracing of the original contract plan, and any changes due to construction or changes of sites are noted on this plan."

The petitioners excepted to the admission of the plan which they apparently regarded as showing less sand and gravel (and earth of a lower quality) than they claimed to have possessed. They also moved to strike it, "on the basis that it was a tracing from some original plan," and excepted to the denial of this motion.

The witness thereupon testified that the plan was an "as built drawing" which "contained details of the borings" on "land within the taking area." He also described the method of making the borings and described their results as shown by the plan, which purported to indicate the character of the soil at various depths at the locatio ns of the

several borings. On cross-examination, the witness testified "that he had supervised making [the] plan" and that the plan was made during the course of construction, which began in this area after February 1, 1955, the date shown on the plan. The witness was unable to explain why this date appeared on the plan.

1. The plan contained data within the witness's general knowledge as the responsible supervisor-manager for the firm of engineers in charge of design and construction of this section of the project and accumulated in the course of his duties. The witness knew the area and had observed the petitioners' land. He had participated in obtaining and translating the field information and had supervised the making of the plan. In these circumstances, the trial judge (in the absence of indications of inaccuracy or irregularity in gathering and recording the data) could reasonably regard the plan as adequately verified without requiring the testimony of others who had helped in preparing the plan. See *McKarren* v. *Boston & No. St. Ry.* 194 Mass. 179, 180–181; *Everson* v. *Casualty Co.* 208 Mass. 214, 219–221; *Hews* v. *Troiani,* 278 Mass. 224, 227–228; Wigmore, Evidence (3d ed.) §§ 790–794; McCormick, Evidence, §§ 179–181, 184. See also *Suburban Land Co. Inc.* v. *Arlington,* 219 Mass. 539, 542; *Howe* v. *Boston,* 311 Mass. 278, 281–282; *Kuklinska* v. *Maplewood Homes, Inc.* 336 Mass. 489, 495–496. Cf. *Amee* v. *Boston & Albany R.R.* 212 Mass. 421, 425 (where oral testimony about the contents of plans not prepared by the witness or under his direction, or in the performance of any duty, and not offered in evidence, was held inadmissible).

2. The engineer testified that the plan was a copy of an original on cloth. Examination of the original exhibit shows it to be a blueprint (blue lines on white background) made, on sensitized paper of some sort, from the original plan. Although more specific and searching questions could have been put to the witness in obtaining verification of the exhibit, the fair import of his testimony is that the exhibit actually offered in evidence through him, the engineer in

charge of this phase of the work, itself reflected the "details of the borings" and what he and the persons acting under his supervision discovered by the aid of the borings.

In the circumstances, it was within the sound discretion of the trial judge to receive a photographic or blueprint copy of the plan in evidence without requiring production of the cloth original or of the earlier plans used in the compilation. No suggestion is made that the exhibit in fact introduced was not a photographically precise copy of the cloth original, or that it contained inaccuracies that would render a copy in any way prejudicial. See *Blair* v. *Pelham,* 118 Mass. 420, 421; *De Forge* v. *New York, N. H. & H. R.R.* 178 Mass. 59, 61–64; *Eldredge* v. *Mitchell,* 214 Mass. 480, 481, 483; Wigmore, Evidence (3d ed.) §§ 790–794, 1231, 1234; McCormick, Evidence, §§ 179–181, 184, 209. See also *Hews* v. *Troiani,* 278 Mass. 224, 227–228. This is not a case where, in order to ensure accuracy, secondary evidence of the contents of a relevant document is to be excluded, under the preferential "best evidence" rule, in the absence of production of the original or proof that after diligent search it remains unavailable. Cf. cases like *Howe* v. *Ware,* 330 Mass. 487, 489; Wigmore, Evidence (3d ed.) §§ 1171–1191; McCormick, Evidence, §§ 195–200, 206. Cf. also *Fauci* v. *Mulready,* 337 Mass. 532, 540–542. Here the blueprint of the plan, as we view the engineer's testimony, in effect was itself a reflection of the witness's actual and official recorded knowledge of the borings, as fully as was the cloth original. The circumstance that the witness could not explain why the date on the plan preceded actual construction went only to the weight of the evidence and not to its admissibility.

*Exceptions overruled.*